## THE TOMBSTONE MILL AND MINING COMPANY, APPELLANT, *v.* THE WAY UP MINING COMPANY, RESPONDENT.

APPELLATE COURT WILL NOT DISTURB FINDINGS OF FACT BY TRIAL COURT, where there is substantial evidence to sustain them, unless errors of law have occurred, requiring a reversal.

OWNER OF MINING CLAIM CAN ONLY FOLLOW HIS VEIN OR LODE ON ITS DIP, when the vein or lode dips substantially at right angles with the strike of the vein or lode. He can not follow the vein outside of his claim on the course or strike of the vein in any case. If the vein crosses the side lines on its strike, such side lines become the end lines, and terminate the owner's right to follow the vein in that direction.

ORE BODIES FORMED OFF FROM AND CONNECTED WITH A FISSURE VEIN do not form a separate vein, lode, ledge, or mineral deposit,

APPEAL from the district court of the first judicial district, county of Cochise. The facts are stated in the opinion.

*John Haynes* and *Thomas Mitchell,* for the appellant.

For the purpose of this argument on appeal, there is no dispute that the Good Enough claim was duly located March 25, 1878; that the Way Up claim was duly located September 26, 1878; that the appellants own and are in possession of the said Good Enough claim, and the respondents own and are in possession of the Way Up claim; and that these claims are substantially at right angles to each other, the northerly side line of the Good Enough coinciding with the southerly end line of the Way Up claim.

The action was brought by the appellants, plaintiffs below, to recover possession of part of the Good Enough lode, which underlies the surface of the Way Up claim, from which they alleged they had been ousted by the respondents, defend- · ants below. They alleged that the top or apex of the Good Enough lode lay within the side lines of the Good Enough claim, and that said lode, in its course into the earth, so far departed from a perpendicular that it entered the land adjoining, to wit, the land underlying the Way Up claim; that the Way Up company had sunk a shaft from the surface of their claim about five feet away from the Good Enough side line, and had broken in and taken possession of a part of the Good Enough lode, which this shaft had broken into on the dip of such lode.

The answer in effect denies that the top or apex of the Good Enough lode lies within the surface side lines of the plaintiffs' claim and that that lode enters the Way Up claim upon its dip; and alleges that the lode crosses the Good Enough claim and enters the Way Up claim on its strike.

If the allegations of the complaint were true, the plaintiffs were entitled to recover the ground in controversy under the plain provision of section 2322 of the revised statutes of the United States.

If the allegations of the answer were true, the plaintiffs could not recover, because they could not follow the vein on its strike beyond the plane of their north-east side line carried down vertically: *Mining Co.* v. *Turbet*, 8 Otto, 463.

Upon the trial below, the plaintiffs, to prove the allegations of the complaint, offered evidence to show that a stratum of limestone outcropped at different places within the side lines of the Good Enough claim; that the strike of this limestone was substantially parallel with the side lines of that claim, and that it dipped into the earth in a north-easterly direction and under the Way Up claim at an angle of from twenty degrees to twenty-four degrees from a horizontal; that overlying the limestone and conforming with the curves of the top of it, was a body of rock called shale; while underlying it and conforming with the curves of the lower limits of it was a body of rock called quartzite; that within this limestone belt, at different places, there were discovered bodies of valuable ore bearing silver and other precious metals; that these ore bodies varied in size and shape and in the angle of inclination to the horizon, some being nearly vertical, some nearly horizontal, some at other angles; that these ore bodies were all connected together by smaller ore bodies or stringers; that the lime was not one solid mass, but, like all limestone deposits, was in different strata, some twelve or fifteen in number, which were sometimes split up into a number of others; that in every case, so far as developed, the spaces between the blocks of the lime were mineralized and sometimes opened into the large ore bodies; that the ore bodies were of two kinds, those which followed strictly these lines, called bedding lines, and lay between the lime strata, and those which entered and occupied the mass of the rock; that the differ-

ent ore bodies as developed extended a distance of four hundred and forty feet lengthwise of the claim, dimensions being taken parallel with the side lines [Map No. 4]. That the yield of ore within these limits had been about twenty-one thousand tons, of which only about one sixth came from the vertical ore bodies and five sixths from the flat ones; that the outcropping of this limestone belt within the lines of the Good Enough would assay in mineral, and in many places the mineral itself came to the surface; that the discovery shaft of the Good Enough lode was sunk upon an outcrop of ore in this limestone; that incline number 2 was sunk on mineral all the way down from the surface to the point where it met the plane of the north side line of the Good Enough claim and broke into the defendants' workings; and they produced assays taken along that incline every ten feet; that the limestone belt varied in thickness, measured at right angles between the shale and the quartzite, from sixty to ninety-five feet, and the boundaries between the underlying quartzite and the overlying rock were clearly distinguished and distinguishable; and that in all their developments no ore had been found outside of these limits, except here and there small insignificant deposits, such as were always to be found in the country rock in the immediate neighborhood of a large lode.

They also proved that this limestone belt was much thinner than the Eureka, which in places was eight hundred and four hundred feet wide on the surface.

The defendants, to prove the denials and allegations of their answer, offered evidence to prove that instead of one body of limestone with well-defined upper wall of shale and lower wall of quartzite, outcropping in the Good Enough claim, there were in fact alternate strata of limestone, shale, and quartzite, as shown on their maps B and C, which ran diagonally across that claim; that the Way Up shaft was sunk upon a true fissure vein which penetrated the shale from the surface down to the limestone, claimed as their lode by the plaintiffs, passing through alternate strata of shale and limestone before it reached that body, and which, after it had passed that body, penetrated the quartzite claimed by the plaintiffs to be the foot-wall of their lode, and penetrated another body of limestone under

the quartzite; that this fissure vein had well-defined walls and could be distinctly traced from the Way Up shaft across the Good Enough claim, into and across the Tough-nut claim, which lies parallel with and south-west of the Good Enough claim, as shown by the red line, marked "Way Up Lode," on their map B. Also to prove other vertical veins crossing the Good Enough claim substantially parallel with the Way Up vein; and that the course of these veins was the general strike of the veins in the immediate neighborhood. Also to prove where the ore in the Good Enough mine came from, and that the Way Up fissure vein was the highway by which it came, whether from above or below, and the ore bodies found in the lime to the one side or the other of this fissure had overflowed from this fissure.

In rebuttal, the plaintiffs called two witnesses to prove that this "true fissue vein," which the defendants called the Way Up vein, was so irregular and hard to be discovered in the Way Up shaft, that a few days before the trial, the defendants put two men to work in the Way Up shaft, with orders from the foreman of the defendants' company to sweep down and clean up the shaft, and if they could find any seam or crack to pick it out so that it would show plain, so that if any witnesses were brought down they could trace it, and that that work was accordingly done.

The court below found against the plaintiffs, and entered judgment on the findings for the defendants.

The plaintiffs thereupon moved for a new trial, for the reasons set forth in their notice, and in the assignment of errors.

When this motion came on to be heard, the court below refused to hear any argument of it, and without examining the evidence or the affidavits of newly acquired evidence, or in any way passing upon the merits of the motion, overruled the motion, *pro forma,* for the reason set forth in the bill of exceptions.

In support of the several assignments of error, we submit:

1. The plaintiffs having been refused a hearing upon their motion for a new trial in the court below, this appeal should be heard in all particulars, as if on a motion for a new trial.

The reasons set forth in the bill of exceptions for the *pro forma* ruling on the motion for a new trial make this point so clear that it certainly can not be necessary to argue it.

But we shall argue, not merely that the findings are against the weight of the evidence, but that there was no evidence to support them, in which case this court will reverse the judgment, even after a motion for a new trial has been fully heard and determined. See *State of Nevada* v. *Mining Co.*, 5 Nev. 415, in which the authorities are so fully reviewed by the chief justice that it seems unnecessary to refer to any other cases. If it were necessary, we should be willing to argue the question under the extreme rule cited by him from New York, that to authorize the supreme court to grant a new trial, "there must be a preponderance of evidence against the findings of the jury, so great as to satisfy us that there was either an absolute mistake on their part, or that they acted under the influence of prejudice, passion, or corruption."

We refer also to the authorities collected in Hilliard on New Trials, c. 14, 2d ed.; *Reed* v. *Reed*, 4 Nev. 395; *Tunnel Co.* v. *Tunnel Co.*, 37 Cal. 40; *Minturn* v. *Burr*, 20 Id. 48; *Dean* v. *King*, 22 Ohio St. 134; *Altschul* v. *Doyle*, 48 Cal. 535; *Insurance Co.* v. *Wilson's Heirs*, 8 Pet. 303; *McGatrick* v. *Wason*, 4 Ohio St. 575.

2. A new trial should have been granted, because there was no evidence in the case to support the findings of fact, which are not only against the weight of the evidence, but are palpably contrary to the evidence.

The first and second findings simply find the due incorporation of the two companies, plaintiff and defendant, and their title to their respective mining claims.

The findings to which we refer are the following:

3. That there is no vein, ledge, or lode, so far as shown by the evidence, running through the said Good Enough claim parallel with its side lines, but the only vein, lode, or ledge shown by the evidence runs across the said Good Enough claim, and crosses the side lines thereof and enters the Way Up claim on its strike, and the ore mined and taken out by the Way Up Mining Company, defendant, and claimed by the plaintiff herein, was from the said vein, lode, or ledge extending on its strike or course, as aforesaid, across plaintiff's said Good Enough claim in a north-easterly direction, beyond its side line and into defendant's Way Up claim.

4. I find that the plaintiff has not within the boundaries of its said claim and the extended side lines of defendant's claim any mineralized ledge, lode, or vein, belt or zone of rock dipping beyond its side lines into the Way Up claim as alleged and described in the complaint, but that all ore shown by the evidence to have been found within the said Good Enough claim and the extended side lines of the Way Up claim came from, and was connected with, and a part of the said vein, lode, or ledge which upon its strike in a north-easterly direction enters the Way Up claim.

5. I further find that there is no vein, ledge, or lode, or mineralized deposit having its apex within the exterior boundaries of plaintiff's claim except that which crosses the said side lines thereof and enters the Way Up claim.

6. I find that there is no vein, lode, ledge, or mineralized deposit having its apex within the exterior boundaries of plaintiff's said claim, dipping beyond the side line of plaintiff's said claim into the Way Up claim.

We contend, in the first place, that there is no evidence in the case to contradict the positive proof that there exists a belt or zone of limestone which outcrops on the Good Enough claim; that this limestone lies between well-defined limits, having under it a stratum of quartzite and over it shale and other rock in place, and that large bodies of valuable ore bearing precious minerals, gold and silver, are found within this limestone belt or zone; and so far as developments show, and the evidence shows, there is no mineral to be found outside this limestone.

We say the evidence is uncontradicted on this point.

As to the existence, extent, and limits of the limestone belt:

Map number 2 of the plaintiffs is a section through the plane of incline number 2 on the Good Enough lode. Map C of the defendants is the same. Both show the different strata of rock which form the earth's surface at this point, and both represent these strata as dipping at an angle of about twenty-four degrees from the horizontal out of the Good Enough ground into and under the Way Up claim.

It appears, from the uncontradicted evidence in the case, that there exists a belt, zone, or stratum of limestone lying between a rock called shale above it, and a different rock

called quartzite below it, of a width of from sixty to one hundred feet measured at right angles to these boundary rocks, which outcrops upon the Good Enough claim opposite the Way Up claim, and dips into the earth from the Good Enough claim at an angle of about twenty-five degrees, and under the Way Up claim; that the shaft sunk by the Way Up Company near the Good Enough north side line cuts this limestone, and their incline from that shaft is upon a body of ore found in that limestone, and is a continuation of the same body of ore the plaintiffs were working upon in the lower portion of their incline 2, and that large quantities of ore have been found in this limestone extending over a distance of four hundred and forty feet measured parallel with the Good Enough side lines (without counting the ore body in the Good Enough entirely west of the Way Up claim, known as the combination ore body, to which particular reference will be made in speaking of the affidavits of after-acquired evidence, filed with the motion for a new trial), and that all the ore found by either party, with insignificant exceptions, has been found in this limestone zone.

It is evident, therefore, that when the learned judge in the court below found as a conclusion of fact "that the plaintiff has not, within the boundaries of its said claim and the extended side lines of the defendants' claim, any mineralized ledge, lode, or vein, belt or zone of rock dipping beyond its side lines into the Way Up claim as alleged and described in the complaint" (fourth finding); nor "vein, ledge, or lode or mineralized deposit having its apex within the exterior boundaries of plaintiff's claim" (fifth finding);- and when he found that "there is no vein, ledge, or mineralized deposit having its apex within the exterior boundaries of plaintiff's said claim dipping beyond the side line of plaintiff's said claim into the Way Up claim" (sixth finding), he found not merely against the weight of the evidence, but against the uncontradicted testimony of the witnesses on both sides.

If he meant by his findings that the mineralized belt or zone of limestone, which both sides agree had its apex within the plaintiffs' claim, was not a "mineral vein, lode, or ledge" within the meaning of the act of congress, then

the finding is one of law and not of fact, but as such it is equally erroneous.

This point was elaborately discussed in the case of *The Eureka Co.* v. *The Richmond Co.*, 4 Saw. 302.

In that case, as in the present, a limestone belt or zone of rock was claimed as the lode. We learn from the report of the case that the limestone lay between an underlying quartzite several hundred feet in thickness and an overlying belt of clay or shale ranging in thickness from less than an inch to seventy or eighty feet. At the east end of the zone the quartzite and shale approached so closely as to be separated by a bare seam less than an inch in width. From that point they diverged until on the surface of the Eureka mine they were about five hundred feet apart, and on the surface of the Richmond mine about eight hundred. Throughout this limestone, in various forms, mineral was found, sometimes in a series or succession of ore bodies more or less closely connected, sometimes in apparently isolated chambers, and at other times it would seem to be scattered grains. And we learn from Professor Keyes (who was a long time superintendent of the Eureka mine) in his testimony in the present case, page 300, that not more than one per cent. of this limestone contained pay ore.

The court, all the judges, Field, Sawyer, and Hillyer, uniting in the opinion, held this limestone zone to be a vein or lode, and their judgment was affirmed on appeal by the supreme court of the United States, 13 Otto, 839. In the supreme court Chief Justice Waite, after reciting the patents to the Eureka and Richmond companies, says: "In this way the companies received from the United States the right to work the entire metal-bearing rock from the quartzite to the shale between the end lines of their patented surveys extended downwards and following the dip of the mineralized limestone zone."

We forbear to make any extracts from the opinion in the court below, but commend the whole of it to the careful consideration of the court. And we submit that the case is, in all essential particulars, exactly like the one now before the court.

Finally, we submit that a new trial should have been

granted, because the court erred in entering judgment for the defendants upon the findings.

1. The findings do not support the judgment.

In the former part of this brief, when we were arguing that the evidence did not support the findings, we were obliged to assume, for the sake of the argument, that the court had found such and such facts against us. Now, however, we are obliged, of course, to assume in like manner that the evidence supports the findings.

In determining whether or not the findings support the judgment, the court will not look beyond the judgment roll; the sufficiency of the evidence is admitted by the objection just as the facts in a pleading are admitted by a demurrer. It is upon this basis that we proceed to argue the question.

The test of the sufficiency of a finding is: Would they answer if presented by a jury in the form of a special verdict? *Breeze* v. *Doyle,* 19 Cal. 101.

The statute in this territory provides in regard to special verdicts as follows: "A special verdict is that by which the jury finds the facts only, leaving the judgment to the court. It must present the conclusions of fact as established by the evidence and not the evidence to prove them; and these conclusions of fact must be so presented that nothing remains to the court but to draw conclusions of law from them. Comp. Laws, p. 435, sec. 2613.

Section 2618, p. 436, provides that when the issue of fact is tried by the court, the facts found and the conclusions of law shall be separately stated.

The object and absolute necessity of these rules will appear upon a moment's consideration.

Every pleader knows how difficult it often is to determine whether a proposed allegation is a statement of an ultimate fact or of a mere conclusion of law. In reality, the allegation of the most simple commonplace facts often includes necessarily a conclusion of law. Thus, the ordinary allegations "that the plaintiff is a corporation;" "that the plaintiff was and is seised in fee;" "that the cause of action did not accrue" within the period named in the statute of limitation, although each one of them is the plain statement of an ultimate fact, according to approved precedents,

it includes also a mere conclusion of law. In a case in which either of the first two, for example, was a material issue, if the record simply showed a general verdict or a finding "that the plaintiff was not a corporation," or "was not seised in fee," followed by a judgment for the defendant, it would be impossible for any one to tell upon what questions the trial had turned, whether the plaintiff had failed to prove his allegations as facts, or whether upon the facts proved the court had ruled that as a conclusion of law they did not show incorporation or title in fee. If such a practice prevailed it would be necessary in every case appealed, to bring all the evidence into this court in order to determine whether the judgment was correct, although in reality there might have been no dispute upon the facts on the trial, but the only question discussed there had been, what conclusions of law followed the unquestioned facts.

Such a practice, apart from its inconvenience, as requiring this court in every case to try the whole question over again, would work rank injustice, by reason of the delays and useless expense incident to it.

To avoid just such consequences, we have the well-settled rules as to instructions to the jury when they are expected to return a general verdict, and we have the above express provisions as to special verdicts and findings.

Now, to apply what we have said to the present case. The allegation in the complaint that within the Good Enough claim "there was and is a well-defined vein, lode, ledge, and mineral deposit, or mineralized belt or zone of rock in place, bearing silver, etc., the top outcrop and apex of which lies inside" the boundaries of said claim, although, according to approved precedents, the proper statement of the ultimate facts necessarily includes a conclusion of law, viz., that the mineralized belt or zone of rock in place is a vein or lode. Had the case been tried before a jury the court would have been asked by the plaintiffs to charge, among other things, "that a mineralized belt or zone of limestone rock in place, having a well-defined hanging wall of shale and foot-wall of quartzite, and which outcropped upon the surface and dipped into and under the ground at an angle of twenty-four degrees,

was a vein, lode, or ledge within the meaning of the act of congress. And that if they found from the evidence that the plaintiffs had the outcrop of such a limestone zone within the exterior limits of the Good Enough claim, and that the limestone was mineralized, and that it so far departed from a perpendicular in its course downward into the earth as to enter the Way Up claim, etc., then their verdict should be for the plaintiff."

Had the court refused such an instruction the cause would have stood in this court upon a mere question of law, viz.: Whether or not the court erred in refusing to so instruct? Had the court given the instruction, and the jury found for the defendants, the only question would have been one of fact—was the verdict supported by the evidence?

But we submit, with very great confidence, that if the court, instead of thus stating to the jury the facts, which it was their province to decide, and telling them what the law was as applicable to such facts, had merely instructed them that "if they found from the evidence that there was within the Good Enough claim the outcrop or apex of a mineralized vein, lode, or ledge, belt or zone of rock, which dipped, etc., their verdict should be for the plaintiffs, otherwise for the defendants," that this court would not hesitate to say that such instruction was too general, and that it left the jury to decide all the law as well as the facts, without any assistance from the court, whose province alone it was to decide the law. And so if the court had ordered the jury to find a special verdict, and they had found in general terms "that there was no mineralized vein, lode, or ledge, belt or zone of rock, etc.," it would appear for the same reason that no judgment could be entered on such a verdict, for it would not so present the facts "that nothing remained for the court but to draw a conclusion of law from them." It would be a verdict which was a conclusion of fact or of law, according to the meaning which it was intended to express.

Now, when an issue of fact is tried by the court without a jury, there are, of course, no instructions. But the same result is reached by requiring the court to state separately the conclusions of fact and the conclusions of law. And if the findings are so worded that it is impossible to tell from reading them exactly what the judgment is based upon, if

they are susceptible of several different constructions, if it is necessary to look into the evidence to understand them, then they do not comply with either the letter or the reason of the law, and will not support a judgment. Now that is exactly what we find in the present case. Read in the light of the evidence, bearing in mind that there were two veins or lodes spoken of by the witnesses—the Good Enough limestone lode and the Way Up fissure vein—that the defendants did not attempt to prove that the former did not have the strike and the dip the plaintiffs claimed it had, but simply denied its existence in fact and in law, and that the plaintiffs did not attempt to prove that the Way Up fissure vein, if it existed, had not the strike the defendants claimed it had—with the aid of all this outside light we are able to understand that the vein, etc., which the court finds in the first part of the third and fourth findings, is not shown by the evidence and does not exist within the Good Enough claim, is the Good Enough lode; and the vein, etc., referred to in the latter part of the same findings, and to which he finds all the ore belongs, the Way Up vein. But this court can not go outside of the language of the finding, in this way, and wander through eight hundred pages of testimony to ascertain what they mean. That question must be determined by simply reading them. And without any evidence *aliunde*, it is impossible to say with certainty what they do mean. An "expert," if he were on that side of the question, might say that he saw some "evidence" that the meaning was that the court found that the vein alleged by the plaintiff in his pleadings did not run parallel with the Good Enough claim and enter the Way Up claim on its dip, but did enter that claim on its strike. But we hardly think that, grammatically, they will bear that construction. Grammatically construed, the last part of both the third and the fourth findings refers to a different vein, etc., from the vein, etc., mentioned in the first part.

But admitting that they will bear this construction, it is perfectly plain that all the findings, beginning with the third, may be construed as merely finding, as a conclusion of law, that the mineralized deposit, belt, or zone of rock is not in law a vein, lode, or ledge.

The fact that they will bear several constructions is in

itself fatal to them, and we submit that construed in any way they are no more a statement of the facts found than if the court had briefly said: "I find, as a conclusion of fact; that the plaintiff can not recover."

The first conclusion of law finds that the Way Up Company owns the Way Up mining claim, which is utterly immaterial as affecting the right of the plaintiffs to recover. Then it finds that said company owns "all mineralized veins, etc., within its exterior boundaries, and is entitled to recover the same, and to work the same to any depth between vertical planes extending down through its end lines, and to follow the same on its dip beyond its side lines to any depth."

This is not good law to begin with, because they only own such veins, etc., the top or apex of which lie within their side lines, and then they were not seeking to recover anything; they were defending against the plaintiffs' claim to recover. But supposing that the words "top or apex of the veins," etc., were omitted by mistake, and that the clause about recovering was due to forgetfulness as to which side the Way Up Company was on in the case, and substituting the word "their" for "its," before the word dip— for that word refers, as it stands, to the Way Up claim, and not to the veins, etc., and the intention must have been to decree the company's right to follow the veins on their dip, and not on the dip of the claim—we say, after these insertions and amendments the conclusion of law is a correct one as a statement of mining law, but it is altogether outside of this case. It would have been just as correct and just as material if it had also contained the statement that "under the constitution of the United States the said company can not be deprived thereof except by due process of law."

The second finding is the only intelligible one, but it requires some facts behind it to give it any validity.

The various steps in the progress of an action are, first, the pleadings, which settle what the issues are, then the trial of the issues in the *nisi prius* court, then the review of the case in the same court on motion for a new trial, and finally the review in the appellate court. Throughout all these steps a process of elimination goes on. The rules of pleading are intended to get rid of useless and uncontro-

c

verted statements of fact, and to present for trial merely the material issues of fact which result from the allegations on one side and the denials on the other, or the issue of law upon an admitted statement of the facts.   The rules of practice are intended to produce the same effect in the subsequent stages of the cases.

Many points which are urged on the trial at *nisi prius* are often seen by counsel, on reflection, to be untenable or unimportant, and are therefore abandoned; and it is well settled that upon the review on the motion for a new trial, and again on appeal, the court will look only to the particular errors which are properly assigned or specified.   And besides these rules which bind the parties, we have rules of practice which bind the courts, requiring them to properly submit to the jury the questions of fact arising under the evidence, and to properly instruct them upon the law applicable to those facts, and requiring them when there is no jury to state separately "the facts found and the conclusions of law."   And these words do not mean mere statements of facts and statements of law; they mean the facts found from the evidence and the conclusions of law resulting from these facts found.   And we submit that these rules are not merely for convenience, but they confer a right just as important and just as sacred as the right to the trial itself.   The parties have the right not only to have the case tried, but to have it tried in such a manner that it will not be necessary to go over the whole case in its subsequent stages; to have it so tried that all irrelevant, useless, and uncontroverted questions may drop out by the way, and when the case reaches the appellate court nothing but substantial matters in dispute shall remain.   If the case is not so tried, the losing party, however strong his case may be, runs a double risk in this court.   If his attorneys do not submit to the necessities of the case, and argue the whole case *de novo*, the court is apt to fail to discover the real question, and to decide against him upon the general presumptions in favor of the judgment; while if the whole case is fully presented he runs the risk of a very natural presumption that if it requires so long an argument to show that the judgment is wrong, it was probably right.

We submit, therefore, that this court need not look at the

transcript in this case, unless they do so for the purpose of entering a final judgment, for that upon the face of the findings there is nothing whatever to support any judgment.

The so-called findings of fact are not a statement of the facts found from the evidence, but are mere conclusions of law, or at best a mere general finding negativing the allegations of the complaint, and are as indefinite as a general verdict; and the so-called conclusions of law do not result from any facts found, but are mere statements of general propositions and incorrect statements into the bargain.

We refer particularly to the charge to the jury in *Stevens* v. *Williams,* 1 McCrary, 480, because it illustrates what we have said in regard to the manner in which the questions of law and of fact are separated when a general verdict is expected, and because the issues in the case and the facts as disclosed in the evidence were almost identical with those in the present one; and also because Mr. Justice Miller, of the supreme court of the United States, who presided at the trial, expressly adopted, in his charge to the jury, the law as laid down in the Eureka case.

Also upon the same point, to the charge of Judge Hallett in the United States circuit court at Denver, in *Iron Mine* v. *Loella Mine,* 2 McCrary, 121; *Iron Silver Mining Co.* v. *Cheeseman,* Id. 191; *Gallagher* v. *Williamson,* 23 Cal. 332; *Allison* v. *Hagan,* 12 Nev. 60.

We refer, generally, as to special verdicts and findings, to *Polhemus* v. *Carpenter,* 42 Cal. 375.

The court says, at page 386: "The findings are so manifestly defective as not to require comment. Instead of stating facts involved in the issues, they contain only general conclusions drawn from the facts. They afford no information whatever as to the particular facts which the court considered as established in the cause. The defendant was clearly entitled to have more specific findings within the issues; and on this ground the judgment should be reversed and a new trial awarded."

This decision was made under the act of 1861, which required a demand for findings if the party desired them, and under which the doctrine of "implied findings" arose in California.

In 1872, the law was passed which is the same as section

2618 of our compiled laws.   We call attention to the fact also that we have no such provision as is mentioned in some of the California and Nevada cases, requiring exceptions to the findings.   Section 2629, Comp. Laws, p. 438, provides that when the case is tried by the court, and the decision is not made immediately after the closing of the testimony, which was the case here, it shall be deemed excepted to on motion for new trial or on appeal without any special notice that exception is taken thereto.

The Nevada statute is cited at length in *Whitmore* v. *Shiverick*, 3 Nev. 312, and the change in the California practice introduced by the code of 1872 is pointed out in *Dowd* v. *Clarke*, 51 Cal. 262.

We submit, however, that it is only a defective finding which requires to be specially excepted to even in those states.   *Putnam* v. *Lamphier*, 36 Cal. 158.

The rule and the reason of it are analogous to the distinction between a general and a special demurrer.

The objection to the jurisdiction, or that a complaint does not set forth facts sufficient to constitute a cause of action, may be made for the first time in the supreme court.

And upon principle the same rule should be applied to the objection that there are no findings to support a judgment.   That objection does not mean merely that the findings are defective in some particular, but that there is nothing upon the record to support the judgment.   See *Barnes* v. *Sabron*, 10 Nev. 217, and in particular the argument of counsel for the respondents, at page 224, and the reply to it in the opinion, page 248.   See, also, *Hidden* v. *Jordan*, 28 Cal. 306; *Figg* v. *Mayo*, 39 Id. 265; *Coveny* v. *Hale*, 49 Id. 552; *Baggs* v. *Smith*, 53 Id. 88; *Dilla* v. *Bohall*, Id. 709; *Woodson* v. *McCune*, 17 Id. 298.

As to specifications of error, and the reason for requiring them, see *Barrett* v. *Tewksbury*, 15 Cal. 354.

The findings are further fatally defective because they are findings upon facts entirely outside of the issues.

If the evidence offered by the defendants is examined with reference to the pleadings in the case, it will be seen that the great bulk of it was entirely irrelevant.   The only real question for the court to determine under the plead-

ings was, whether the plaintiffs had the top or apex of a mineral vein or lode within the side lines of the Good Enough claim, which vein or lode entered the Way Up claim on its dip. This was the substance of the allegations of the complaint, and the answer simply denied them because the allegation that the only lode the plaintiffs had, entered the Way Up claim on its strike, is merely the repetition, in an affirmative form, of the denial that it entered that claim on the dip.

Now, when we examine the evidence we find that this question was, as we have already pointed out, a mixed one of law and fact. The questions of fact presented by the evidence were, whether a mineral-bearing limestone zone outcropped within the side lines of the Good Enough claim, and if so, whether this limestone zone entered the Way Up claim on its dip.

And the question of law was, whether if the limestone zone existed it was a vein or lode within the meaning of section 2322 of the revised statutes of the United States.

Now, as the plaintiffs did not attempt to show that they had any vein in their ground except the limestone zone, it follows that if the court found against them on either the above questions of fact or of law, that ended the case, and all the evidence about this Way Up fissure was utterly immaterial. In actions of this kind all that the defendant has to do to win is to show that the plaintiff has no title; he does not have to show any right or title in himself. And if the plaintiffs, either as a conclusion of law or of fact, did not have the apex of a mineral vein within their side lines, they could not claim the right to enter the Way Up ground; for that right, unknown to the common law, is granted by the above section 2322 merely as incident to the ownership of the apex of a mineral vein which on its dip enters the land adjoining.

And on the other hand, if the court found that the limestone zone did exist, and did outcrop and dip, as alleged in the complaint, and that in law it was a vein or lode, then all this evidence about a cross fissure was equally irrelevant, because the Good Enough claim, being the older location, was entitled to all the ore contained within the crossing or "space of intersection." In either view of the case, there-

fore, the whole of this evidence about this Way Up fissure was utterly irrelevant.

The only facts, therefore, which it was necessary for the court to find were: 1. Whether or not the plaintiff had within the exterior boundaries of the Good Enough claim the outcrop, top, or apex of a well-defined mineralized belt or zone of limestone. 2. If so, whether or not it entered the Way Up claim on its dip.

Of course there were other issues, such as the incorporation, title, etc., but these were the only facts of importance for the purpose of this argument. In a case which took so long as this to try, and in which there was so much evidence introduced, it would perhaps have been more convenient for the court to have been more specific—to have stated the probative facts from which he found that the limestone was or was not well defined, mineralized, etc., as was recommended in *Morrill* v. *Chapman*, 35 Cal. 85; but the above were, we conceive, the ultimate facts from which the necessary conclusion of law would follow. But instead of finding these facts one way or the other, the only facts found are based upon the evidence about the Way Up fissure, and the opinions of the experts as to where the ore came from; and an examination of the whole case shows that the judgment was determined—if we admit that it was the result of ratiocination at all—by the effect produced upon the court by the evidence upon these wholly irrelevant matters.

That a judgment based on findings of fact outside of the issues is erroneous is a proposition which certainly requires no argument. We refer, however, to *Morenhout* v. *Barron*, 42 Cal. 605; *Devoe* v. *Devoe*, 51 Id. 543; *Robinson* v. *Pittsburg R. R. Co.*, 57 Id. 417.

And even if the findings in the case were unexceptionable, upon no conceivable theory could the court enter such a judgment as the record in this case discloses.

The only judgment the defendants were entitled to was that "they go without day and recover their costs, and that the temporary injunction be dissolved."

Instead of this, the judgment, after reciting in full the findings, proceeds to order, adjudge, and decree *verbatim* all and singular the matters of fact and of law found therein. We are so confident that the judgment in this case must be

reversed on the merits, that it is useless to dwell on minor errors, but we call attention to *House* v. *Mullen,* 22 Wall. 42; 420 *Min. Co.* v. *Bullion Mining Co.,* 3 Saw. 634; *Speyer* v. *Ihmels,* 21 Cal. 280.

In *Knowles* v. *Inches,* 12 Cal. 214, Judge Baldwin, in delivering the opinion of the court, said: "We must reprehend the practice, which is too common, of stuffing a transcript with irrelevant and unnecessary matter. The present case affords a remarkable illustration. The transcript contains some two hundred and thirty-three pages, when everything essential to a review of the case might easily have been given in fifty. Besides the delay, unnecessary expense, and labor thus created, the points are hid in this mass of superfluous matter, and it frequently becomes more difficult to find out what they are than to decide them when found."

We think the court will see that no apology is necessary from the present appellants for the very voluminous record in this case.

The fault certainly is not theirs. It results from the manner in which the trial was conducted.

Everything that was offered under the name of testimony was allowed to go in, and we believe the record shows but one single instance of an objection to evidence being sustained, and that was based upon grounds which generally prevail even in a justice's court. And then, after holding the case under advisement for five months, his honor filed the so-called findings, which we have been discussing, which failed to disclose expressly any of the reasons which led to his decision and left the case to be tried all over again in its next stage. And as the appellants failed to get a hearing on their motion for a new trial, and have appealed to this court on the ground, among others, that the findings are not supported by the evidence, they were compelled to bring here all the evidence. We have contended that the great bulk of it was irrelevant in the court below, but the necessity to have it all here in order to have a hearing on the questions raised by the appeal from the order overruling the motion for a new trial, makes it material in this court.

But we have cited Judge Baldwin's dictum to call particular attention to the concluding paragraph. Recognizing the truth of what is there said, we have labored hard to

perform the difficult task of finding out the points of the case amid the superfluous matter in which they have been so carefully hidden; of ascertaining what points are uncontroverted in the evidence and what points are irrelevant; in other words, of finding what there is to be decided in this court, and then stating it in such manner that nothing remains for the court but the comparatively easy duty of deciding it. This is the labor which the court below should have performed. To accomplish this same result is the very object of the law which requires the "facts found and the conclusions of law" to be separately stated, and if our success bears any just proportion to the time and labor spent in these efforts, we feel that no apology is necessary from us for the length of this brief.

We respectfully suggest that sufficient of the evidence appears in our discussion of the second point to enable the court to dispose of the different objections to the findings discussed under the third point, and that if those objections, or any of them, are well taken, it will be unnecessary for the court to encounter the labor of even reading the transcript.

And, in conclusion, we have only to say that voluminous as the record is, and immense as have been the labor and time expended upon this case, it has no claim to rank as a case of even ordinary difficulty. It presents the simplest possible questions both of fact and of law.

Viewed from the standpoint of facts, the case is no new one. It is simply the case of one party owning a rich and valuable mine, and working and developing it in the manner permitted to him by law; of the other party, beginning by casting envious eyes upon his neighbor's luck, and ending by breaking into that neighbor's mine, through his wall, like a burglar—in the dark. Every mining camp has seen at least one such experiment, and owing to the prejudices and ignorance of jurors, and sometimes to the inability of the judge before whom the case comes, to find the points of the controversy amid the rubbish with which experts, falsely so called, are able to surround them, speculations in mining of that character have sometimes been made to pay.

Viewed from the standpoint of the law, however, the present case is unique. In all other such cases that we

have any knowledge of, some grave question of law has arisen for the first time, and the interest of the case to all outside of the parties immediately concerned has turned on the decision of this new question. But all the law of this case had been decided before it began. That the defendants had no real hope of distinguishing it from the Eureka case, is apparent from the desperate efforts they made to enlarge a little seam (which one of their own witnesses, a miner, said—looking up for inspiration from above to enable him to describe it—was like "that crack in the ceiling") into a "true fissure vein," by "retaining" experts to swear that it was. And as the most unique feature of all, it appears, after all the evidence on this point has been received, that the plaintiffs could afford to admit all that it was offered to prove, and even that the crack was a well-defined fissure vein, as many feet wide as the defendants chose to say it was, without, in the slightest degree, affecting their right to recover in the case.

The odd feature of "a great mining suit," of the class to which the present one belongs, is that it is looked upon by all outside observers as a game of chance. They have no doubt about the right of the matter, but merely of the result. There is not enough question about the right of the matter to get up a discussion. The interest in the game lies in the uncertainty of the result. And upon this subject parties are equally divided according as they put their faith in this or that expert or lawyer, and the ability of their champion to muddle the matter, to work upon the passions or prejudice of the jury, or by their eloquence to sway their judgment.

Now we submit that a game like this should end in this court. The whole testimony is before the court, and their power to enter a final judgment is, we submit, complete. R. S. U. S., secs. 1868, 1869; Comp. Law, sec. 2342; Id., p. 15, sec. 2; p. 20, sec. 10.

But, if this case must go back for a new trial and the farce be played over again, we respectfully ask the court to settle the law of the case now, and to brush away all the rubbish about the Way Up vein and the theories about where the ore came from, etc., so that the trial may be had upon the only issue of fact in the case, viz., the existence of the limestone lode.

*Lewis & Dibble* and *J. D. Rouse*, for the respondent.

The plaintiff in this action bases its right of recovery upon the assumption that there is a great mineralized belt or zone of limestone within its boundaries, lying between a hanging wall of shale and foot wall of quartzite, having its course or strike substantially parallel with the side lines of its Good Enough claim, and that such belt or zone on its dip enters the defendant's claim. And it is claimed that the ore extracted by the Way Up company was from the ore body or zone so dipping into its claim from the Good Enough. This theory was attempted to be sustained by proof that large bodies of ore had been discovered and mined by the plaintiff, which had a general direction with the side lines of its claim.

The defendants, on the other hand, contended that there is no such belt or zone of mineral-bearing rock, having a direction or strike as claimed by the plaintiff, but claimed that there is a true fissure vein crossing both side lines of the plaintiff's claim and entering the Way Up ground on its strike; that the lateral ore bodies found in the Good Enough are simply flat or blanket bodies, which were deposited in the limestone from the fissure, and that they form a part of such fissure and are invariably connected with it.

After the facts were shown by plaintiff that shale was found, apparently forming a hanging wall, and quartzite a foot wall, and that ore bodies were found having, as we have stated, a general direction parallel with the side lines of its claim, the defendant established, by uncontroverted proof, the existence of a cross fissure as above stated, and that such fissure possessed the chief and distinguishing characteristics of a true fissure vein—namely, that it cut and penetrated all the formations, homogeneous and non-homogeneous rocks, the shales, limestones, and quartzites, and that its strike was nearly at right angles with the plaintiff's so-called limestone lode or belt, and also with the side lines of its claim; that such fissure is a true vein, and that it can be readily traced far beyond the plaintiff's side lines into adjoining claims.

We also showed that the fissure is traceable from the surface continuously down the defendant's shaft and into its

very deepest workings, two hundred and eighty-six feet below the mouth of the shaft, and from the shaft into its claim as far as its workings have penetrated, and into the ore body in which it was mining at the time this action was brought.

The witnesses on behalf of the defendants, with two exceptions, were entirely disinterested, and were all men of great experience and more than common intelligence.

On the other hand, the plaintiff's witnesses were all persons in its employ, as miners or otherwise.

After a thorough trial of the case upon its merits, the court held the case under advisement for about five months, and then rendered findings and judgment in favor of the defendant.

Before calling attention to the evidence adduced on behalf of the defendant, it may be well to refer to some of the legal principles which govern the case and some of the authorities which must guide us in arriving at a conclusion as to the rights of the respective parties.

To constitute a fissure vein, its dimensions are of no consequence; neither is its regularity or irregularity, its richness or its barrenness. It may be wide or narrow, or wide in some places and diminishing to almost imperceptible dimensions in others. It may be rich in places and very poor in others.

This has been repeatedly judicially determined.

In the case of *North Noonday Mining Co.* v. *Orient Mining Co.*, 6 Saw. 308, Judge Sawyer said: "A vein or lode, authorized to be located, is a seam or fissure in the earth's crust, filled with quartz, or with some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute.

"It may be very thin, and it may be many feet thick, or thin in places—almost or quite pinched out, in miner's phrase—and in other places widening out into extensive ore bodies. So also in places it may be quite or nearly barren, and at other places immensely rich. It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, at the point of discovery within the lines of the claim located, to entitle the miner to make a valid location, including the vein or lode."

He affirms the same thing in identical language in the

*Jupiter Mining Co.* v. *Bodie Con. M. Co.*, 7 Saw. 107; S. C., Copp's U. S. Min. Lands, 2d ed., 381–388. See also *Stevens* v. *Williams*, 1 McCrary, 488; *Foote* v. *National M. Co.*, 2 Mont. 402.

All scientific authority is to the same effect.

" Veins are aggregations of mineral matter in fissures of rock. Lodes are, therefore, aggregations of mineral matter containing ores in fissures. As all veins are aggregations of mineral matter in fissures, their form necessarily approaches the tabular. Veins are never really tabular, as they not only thin out gradually towards their ends, but very frequently exhibit irregularities in their whole extent which are caused by unequal breadth and deviations from the plane of their course. The breadth or size of veins is very variable—some are not thicker than a sheet of paper, while others are several hundred feet thick. Under these circumstances it is impossible to give a mean breadth for lodes; although, as a rule, most paying lodes average between six inches and five feet." Von Cotta on Ore Deposits, Prime's translation, 26.

" By vein, as a geological and mining term in general, is understood an aggregation of mineral matter of indefinite length and breadth, and comparatively small thickness, differing in character from and posterior in formation to the rocks which inclose it. A true vein may be defined as a fissure in the solid crust of the earth, of indefinite length or depth, which has been filled, more or less perfectly, with mineral substance; or, in other words, an aggregation of mineral matter, accompanied by metalliferous ores, within a crevice or fissure, which had its origin in some deep-seated cause, and may be presumed to extend for an indefinite distance downward." Whitney's Metallic Wealth of the United States, 49; see also page 54.

" Veins are narrow plates of rock intersecting other rocks. They are the fillings of cracks or fissures; and as these cracks or fissures may either extend through the earth's crust and divide it for any distance, or reach down only to a limited depth, or be confined to a single stratum, so veins are exceedingly various in extent. They may be no thicker than paper, or they may be scores of rods in width, like the great fissures opened in times to the earth's inner regions

A. T. REPS. I—29

by subterranean agency." Dana's Manual of Geology, 108, 109.

"Mineral veins vary in thickness from merely an inch or less up to many fathoms." Prof. Geike, 10 Ency. Brit., 9th ed., 317.

One of the characteristics of a fissure vein is that it cuts all the formations or different strata of the earth's crust.

Von Cotta says that true veins "traverse a rock or formation independently of its texture and position, and not parallel to its stratification or foliation." Von Cotta on Ore Deposits, 28. See also Whitney's Metallic Wealth, 49.

"The most essential definition of a true fissure vein is satisfied when a deposit is shown to break indiscriminately across one stratum after another of non-homogeneous rock; and compared with this requirement, all other signs of fissuring have justly been held to be of only secondary importance." Church on the Comstock Lode, 168.

So it is held that when a vein of this character crosses the side lines of a claim they become end lines, and must be projected vertically, so that the side lines in such case mark the limit to which the locator may explore. *Mining Co.* v. *Tarbett,* 98 U. S. 463; S. C., Copp's Min. Lands, 347–350; *Stevens* v. *Williams,* 1 McCrary, 490.

The *Eureka Case,* 4 Saw. 302, bears no resemblance to the case at bar. Since the decision in that case, many efforts have been made, under color of the opinion therein, to locate or claim large belts or zones of rock in mining regions as lodes; and the plaintiff claims that its alleged limestone lode is one like that in the *Eureka Case.* In that case the court gave to the term lode its widest possible signification, but still limited it to mineralized rock. Id. 312.

Mr. Justice Field, in his opinion, was very careful to show the mineralized character of the Eureka lode. After describing the boundaries he says (p. 312): "The limestone found between these two limits—the wall of quartzite and the seam of clay or shale—has, at some period of the world's history, been subjected to some dynamic force of nature, by which it has been broken up, crushed, disintegrated, and fissured in all directions, so as to destroy, except in places of a few feet, so far as explorations show, all traces of stratification; thus specially fitting it, according to the testimony

of the men of science, to whom we have listened, for the reception of the mineral which, in ages past, came up from the depths below in solution, and was deposited in it. Evidence that the whole mass of limestone has been, at some period, lifted up and moved along the quartzite, is found in the marks of attrition engraved on the rock. This broken, crushed, and fissured condition pervades, to a greater or less extent, the whole body, showing that the same forces which operated upon a part operated upon the whole at the same time. * * * The broken, crushed, and fissured condition of the limestone gives it a specific, individual character, by which it can be identified and separated from all other limestones in the vicinity. * * * Throughout this zone of limestone, as we have already stated, mineral is found in the numerous fissures of the rock. According to the opinion of all the scientific men who have been examined, this mineral was brought up in solution from the depths of the earth below, and would, therefore, naturally be very irregularly deposited in the fissures of the crushed matter, as these fissures are in every variety of form and size, and would also find its way in minute particles in the loose material of the rock. The evidence shows that it is sufficiently diffused to justify giving to the limestone the general designation of mineralized matter—metal-bearing rock."

His conclusion is based upon the testimony of experts in the case, one of whom (Dr. Hunt) he quotes as follows: "My conclusion is this, that this whole mass of rock is impregnated with ore."

There is no resemblance whatever between the limestone found in the Eureka and that found in the Good Enough. The former case presents a great crack in the earth's crust, the walls of which are separated at one point by a bare seam, and, diverging, are several hundred feet apart at another point. While these walls diverge upon the surface, they converge as they descend into the earth, so that at no great depth they must come together.

The underlying formation or foot wall is quartzite, and the superior rock, or hanging wall, is shale—both sedimentary rocks. Between the two is the limestone, also a sedimentary rock. But from its position it is evident that its

deposition and formation were elsewhere than between the rocks now inclosing it. It is found to be broken, crushed, disintegrated, and fissured in all directions, and all traces of stratification destroyed, except in a few insignificant places.

It is manifest that whatever force of nature crushed and broke up this limestone, precipitated it into this great crack, where it is now found. This is apparent when we consider that if it had been laid down between the shale and quartzite, it would have been conformable thereto, and would have occupied a space between the two of comparatively uniform depth or thickness.

The limestone found in the Good Enough differs in every respect from that found in the Eureka.

It is conceded that the limestone in question in the Good Enough is a stratified rock; that it is conformable to the hanging and foot walls; and that it has an average thickness of about eighty feet, from which it does not greatly vary. No ore has been found in it west of the Way Up fissure (excepting where the forty-foot flat ore body extends for a few feet), but the whole is one unbroken mass of barren rock, extending for hundreds of feet. So, also, is it everywhere, except where it is intersected by the Way Up fissure, and the flat ore bodies connected with it, which occupy but small space as compared to the mass. Neither is the limestone impregnated with ore, nor is there any such diffusion of mineral therein, "as to justify giving to it the general designation of mineralized matter, or metal-bearing rock," as in the Eureka case. Neither has it any "specific, individual character, by which it can be identified and separated from all other limestone in the vicinity," but, on the contrary, it differs in no respect from large bodies of limestone in the immediate vicinity, one of which is separated from it only by the shale, called by the plaintiff its hanging wall.

It is admitted to be a stratum of sedimentary rock, lying between two other sedimentary rocks, all of which were originally laid down in the bed of the ocean, and subsequently tilted up by some great dynamic force of nature.

It is impossible to conceive of this as a mineral vein or lode. It certainly is not one within the meaning of the act of congress, or the understanding of geologists or miners;

and none but those in the employ of the plaintiff ever had the hardihood to so characterize it.

Mr. Justice Field arrived at his construction of the meaning of the term lode as used in the act of congress by assuming that "cinnabar is not found in any fissure of the earth's crust, or in any lode as defined by geologists;" and as the act authorizes the location of any "vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper," he says that "any definition of lode, as there used, which does not embrace deposits of cinnabar, would be as defective as if it did not embrace deposits of gold or silver." How he could have fallen into the error of supposing that cinnabar is not found in veins, fissures, or lodes, is unaccountable.

Von Cotta describes a large number of lodes of the ores of mercury (cinnabar) found in the Saarbrück coal basins, and occurring in veins and fissures. Treatise on Ore Deposits, Prime's translation, c. 6, p. 200. Cinnabar is also found in veins at Almaden, in Estremadura. Id. 399, 400.

Professor Blake testified in this case to the occurrence of cinnabar in lodes. He said: "I have never seen any cinnabar mines that were not lodes. The New Almaden I consider a lode. It is irregular, but the cinnabar is in a vein, traversing strata which the French call *filons*. So also at Coulterville, California, there is a vein of cinnabar in quartz."

Therefore, the supposed necessity of enlarging the meaning of the term "lode" to embrace cinnabar rests upon a false premise, and requires a return to the canons of construction, that words in common use are to be taken in their natural, plain, obvious, and ordinary signification, and technical words are to be taken in a technical sense unless a contrary intention appears clearly from the context.

Considered in its plain, obvious, or technical meaning, the term "lode" will give rise to no disputes among miners, and will carry out the evident intent of congress, to use it in the same sense as the word "vein" is used, the terms being everywhere convertible.

A belt or zone of metalliferous rock, even where such might be designated a lode, can not be permitted to swallow up true fissure-veins found within it.

It is so held in the "Callison case." The Callison vein was found within a metalliferous belt or zone, which the Mount Diablo Company claimed to be one lode, and of which they asserted ownership. Their claim was based upon the theory supposed to be established in the Eureka case, and they called to their assistance Mr. Keyes, who seems to be the author of the "one-ledge" theory, and can always be found ready to support it, or at least advocate it, as he did in this case. The case was tried before Judges Sawyer and Hillyer, who both sat in the Eureka case, and concurred in the opinion therein. And commenting upon that opinion they said: "It was never intended in that case to hold that every metalliferous zone of country to which boundaries could be found, must be regarded as one lode, for this would be to reduce all mining districts to one lode."

Coming to the vein in controversy in the case, the court said:

"Having such a zone or district, when we find within it fissures like that opened by the Callison, filled with ore, we think we must regard them as veins or lodes. For while metalliferous rock in place may be so found within defined boundaries as to require recognition as a lode, although not in a fissure, a broad metalliferous zone can not be permitted to swallow up, under the name of lode, true fissure-veins found within it." *Mt. Diablo M. & M. Co.* v. *Callison*, 5 Saw. 439.

All metalliferous veins in the Tombstone mining district have a strike parallel to that of the Way Up lode.

The evidence in the record upon this point is uncontradicted.

The parallelism of such veins is usual in mining districts, thus making it probable that there is no vein or lode trending in the direction claimed by the appellant.

Von Cotta says: "As a rule, lodes occur associated together, so that when one lode has been discovered, there is a great probability that others of a similar kind will be found in the neighborhood; they are generally arranged in groups, tolerably parallel to one another." Treatise on Ore Deposits, Prime's translation, p. 33. "In every district where metalliferous veins occur, there are generally quite a number of them together, which often seem to form groups, in which they are parallel to one another." Id., p. 28.

Dana says: "In studying veins, besides noting the extent of their mineral character and structure, it is important to ascertain their strike and angle of dip. There is generally an approximate unity of strike in a given region, and frequently the direction is parallel to the principal line of elevation in the region." Manual of Geology, p. 113; see also Id., 774; Whitney's Metallic Wealth of U. S., 58.

There is no apex of any lode or vein found within the exterior boundary lines of the plaintiff's Good Enough claim (except that of the cross fissure—the Way Up lode); hence, plaintiff has no right to follow any ore body beyond its side lines. U. S. R. S., sec. 2322; *Stevens* v. *Williams,* 1 McCrary, 482; *Iron Mine* v. *Loella Mine,* 2 Id. 124; Wade, secs. 35, 36.

The cases cited hold that the top or apex of a lode is the end or edge, or terminal point of the lode nearest the surface of the earth, "it being essential," says Mr. Justice Miller, "to such top or apex that there be no vein continuing beyond it." If the highest point is merely a swell in the mineral matter, it is not an apex in the meaning of the statute. If it be continuous from one side to the other of the location—that is to say, if, coming in at one side, it passes unbroken to the other—it can not be followed beyond the lines of its location. "And no location can be made on the middle part of a lode, or otherwise, than at the top and apex, which will enable the locator to go beyond his line."

We have traced a well-defined fissure vein, from the Tough Nut, across the Good Enough, into the Way Up, showing a vertical structure the whole distance, and carrying ore nearly the whole of that distance from the surface to the deepest workings along its course. We have shown that it cuts indiscriminately across one stratum after another of non-homogeneous rock—shale, lime, and quartzites, and descends into the earth as far as any work upon it has penetrated, and is still found going down.

Against the evidence establishing these facts the plaintiff produced nothing. None of its witnesses, not even its expert and superintendent, denied the existence of this fissure vein. The testimony of the rocks confronted them, and they could not hope to impeach this silent and immutable evidence of nature, which admits no contradiction.

But with desperate tenacity the plaintiff clings to the theory that the presence of flat ore bodies running perpendicularly to the fissure may be accepted by some as evidence of a lode having a general direction approximately parallel to the side lines of its claim. But all the evidence shows, and the plaintiff could not deny, that these flat ore bodies were connected with the fissure, and descend as they depart from it; that they were formed in all probability by a flow of thermal waters, which ascended or descended through the fissure, bearing carbonic acid and mineral matter, eating out the soluble rock and depositing the ore bodies. Thus were the plaintiff's blanket and pea-pod deposits formed from the fissure, belong to it, and are a part of it, it being the only vein in the premises.

The truth of this is rendered absolutely certain by the facts in evidence; that the walls of the fissure show movement by elevation or depression, so that the stratification, which is broken through by the fissure, does not now lie in a corresponding position on either side—the lime, for instance, on one side of the fissure being several feet above the corresponding lime of the other wall, and perhaps opposed by quartzite; while the ore bodies in the fissure, the flat ore bodies lying across it, and those connected with it are unbroken: demonstrating that they were all created subsequently to the fissure, and their origin must be referred thereto.

The plaintiff's other theory of the existence of a great limestone lode extending from the shale above to the quartzite below, is shown by the evidence already quoted to be utterly without foundation.

But the demonstration of its falsity is complete, by the fact that plaintiff's incline No. 1 runs under a lower body of shale than its incline No. 2 does. In order to fully appreciate the force of the evidence upon this point, it is necessary to read the testimony in connection with the surface maps, which show that the head of incline No. 1 is almost due south of the head of incline No. 2; so that the prolongation of a line drawn through the heads of the two inclines would intersect the side lines of plaintiff's claim. The inclines are about one hundred feet apart, so that if the roof of incline No. 1 is the same body of shale beneath which

No. 2 descends, the strike of the underlying limestone must be nearly at right angles with the plaintiff's side lines. Plaintiff's experts saw the difficulty of reconciling these facts with their theories, and so suggested that there must be a fault there; but it is plain the fault is in their theories, because both Professor Blake and Mr. Stretch are positive that there is one or more bodies of lime lying between the shales, beneath which the inclines descend. And they say such lime is plainly visible upon the surface.

Thus falls the great "one-ledge" theory so tenderly brought forth by the plaintiff.

We contend that upon all the issues the evidence is overwhelmingly in favor of defendant. But upon motion for a new trial, it is only necessary for the successful party to show a substantial conflict of evidence, to entitle him to sustain his judgment. *Visher* v. *Webster*, 13 Cal. 58; *Phillpotts* v. *Blasdel*, 8 Nev. 66; *Treadway* .v. *Wilder*, 9 Id. 67.

And upon appeal the appellate court will never reverse a judgment if there is any substantial evidence to sustain it, unless there be errors of law upon which it can be reversed. *Covington* v. *Becker*, 5 Nev. 281; *State* v. *Yellow Jacket M. Co.*, Id. 415, and cases cited; *Lewis* v. *Wilcox*, 6 Id. 215; *Kile* v. *Tubbs*, 32 Cal. 332; *Lubeck* v. *Bullock*, 24 Id. 338; *McCoy* v. *Bateman*, 8 Nev. 126.

Upon the question of newly discovered evidence, the plaintiff has made no case by its affidavits. They present nothing but cumulative evidence at best.

In the second place, the evidence offered by them is utterly immaterial. The principal fact proposed to be established by them is the continuation of the blanket ore bodies to a greater distance than was shown at the trial. But this fact in no way disproves our theory, that there is a fissure vein running across the side lines of the Good Enough and into the Way Up, nor does it have any tendency to establish the plaintiff's theory, because the extent of these ore bodies in no way disproves the fact of their having been formed from the fissure and made a part of it.

Newly discovered evidence, on motion for new trial, is always looked upon with jealousy. *United States* v. *Smith*, 1 Saw. 277, 290, 291; *Howard* v. *Winters*, 3 Nev. 539.

Newly discovered evidence must be material; must show

it could not have been produced at the first trial, and must not be cumulative. *Howard* v. *Winters*, 3 Nev. 539; *Armstrong* v. *Davis*, 41 Cal. 499; *People* v. *McDonell*, 47 Id. 138; *Reed* v. *Clark*, Id. 204.

The newly discovered evidence must appear to be incontestable. *Buckelew* v. *Chipman*, 5 Cal. 400.

But new developments in a mine are in no sense newly discovered evidence. *Tiernan* v. *Trewick*, 2 Utah, 397.

By Court, PINNEY, J.:

This case comes up on appeal from judgment and order overruling a motion for a new trial. The case was tried by the court without a jury, and the trial judge filed findings of fact and conclusions of law, and a judgment was entered in accordance therewith in favor of defendant. Plaintiff moved for a new trial, but before the motion was disposed of, the trial judge retired from the bench and another judge was appointed in his stead. When the motion for a new trial came up for hearing, it was overruled *pro forma.* The court declining to hear the motion on its merits, not having heard the evidence at the trial of the cause, appellant's counsel now insist this court should, under the circumstances, not be governed in its decision on this point by the general rule that an appellate court will not disturb the verdict of a jury or findings of fact by the trial court where there is a conflict of evidence. They insist that the case should be now heard on appeal, as if it were on motion for a new trial in the district court. In the consideration of the case we have borne in mind the peculiar circumstances surrounding it. Still it must also be borne in mind that every presumption is in favor of the correctness of the judgment, and that neither appellate nor trial court will disturb the verdict of a jury or the findings of fact by the court, where there is substantial evidence to sustain such verdict or findings, unless errors of law have occurred requiring a reversal. *Covington* v. *Becker*, 5 Nev. 281; *Kile* v. *Tubbs*, 32 Cal. 332; *Miller* v. *Balthasser*, 78 Ill. 302.

One of the main reasons for upholding the verdicts of juries and the findings of fact of a court, where there is no indication of improper motives influencing them in coming to a conclusion, and where no errors of law occur, is that

they have heard the testimony, have had an opportunity of observing the conduct and bias of the witnesses, their intelligence, etc., and are, therefore, better enabled to arrive at the true facts of the case than an appellate court possibly can be.   Having in mind the rule, upon an examination of the entire record, if it shall be found that there is no substantial evidence to sustain the findings of fact, or if there be found a material error in the conclusions of law of the court below, it is the duty of this tribunal to reverse or modify the judgment appealed from, otherwise the judgment must be affirmed.   The questions, then, for our consideration, are: 1. Should the case be reversed on questions of fact or findings of the trial court?   2. Is there error of law in his conclusion and judgment?   The complaint alleges the incorporation of plaintiff and defendant; that plaintiff company was the owner and in possession of the Good Enough mining claim and lode in Tombstone mining district, Cochise county, Arizona, which is therein described.   That within said claim there is a valuable vein, lode, lead, or ledge, and mineral deposit of rock in place, bearing silver and other valuable metals, having its top or apex within the exterior boundaries of said claim and dipping in a north-easterly direction at an angle of twenty to twenty-four degrees from the horizontal, passing beyond the side line of the Good Enough claim in that direction, and entering the adjoining land.   That on or about March 1, 1881, defendants ousted the plaintiffs from that portion of its vein or lode which had been opened and developed by defendants beyond the north-east side line of the Good Enough claim and beneath the surface of the Way Up mining claim, which at that point adjoins the Good Enough claim.   Then follow allegations of value of ore and occupation.   The other causes of action are substantially the same, with variations as to value of ore mined, etc., followed by a prayer for an injunction and for recovery of said land and premises and for damages.

The claim for damages was dismissed without prejudice, and the question of right of possession alone tried.   The defendant's answer specifically denied the material issuable facts stated in the complaint, and for defense alleges that the Way Up Company is the owner of, and was in the pos-

session, and entitled to the possession of the Way Up mining claim, and of all veins, mineral deposits, etc., the apexes of which were embraced in its exterior limits. Alleges that the ore body developed within the Way Up claim by defendant is a vein or ledge having its apex within the Way Up claim, and prays that defendant may go hence, and for costs. It is not a cross-bill, but set up as matter of defense, and not as a counterclaim, which seems necessary under this practice. *Brannan* v. *Paty*, 58 Cal. 330. An injunction was granted at the commencement of the action, which was dissolved on the rendition of the judgment. On the issue thus formed the case was tried in the court below, the judge filed his findings of fact and conclusions of law, and judgment was entered accordingly. The findings are, in substance: That plaintiff and defendant were each incorporated, and the respective owners and in possession of the Good Enough and Way Up mining claims; that there is no vein or ledge running through the Good Enough claim parallel with its side lines, but that the only vein, lode, etc., shown by the evidence runs across the said Good Enough claim, and crosses its side lines, and enters the Way Up claim on its strike; and the ore raised and taken out by defendant company was from said vein, lode, etc., extending on its strike or course as aforesaid across said Good Enough claim in a north-easterly direction beyond its side lines, and into defendant's Way Up claim; that plaintiff had not, within the boundaries of its said claim, any mineralized ledge, lode, belt, zone, etc., of rock dipping beyond its side lines into the Way Up claim as alleged and described by plaintiff; that all ore shown by the evidence to have been found within said Good Enough claim and the extended side lines of the Way Up claim came from, was connected with, and was a part of said vein, lode, or ledge, which upon its strike in a north-easterly direction entered the Way Up claim; that there is no vein, ledge, lode, or mineralized deposit having its apex within the exterior boundaries of plaintiff's claim, except that which crosses its side lines and enters the Way Up claim. The sixth and last finding is, that there is no vein, lode, ledge, or mineralized deposit having its apex within the exterior boundaries of plaintiff's claim, dipping beyond the side lines of plaintiff's said claim into the Way

Up claim; and as conclusions of law the trial judge found that the defendant was the owner of the Way Up mining claim, with all its veins, etc., and was entitled to recover and work the same, and that plaintiff is entitled to take nothing by the action, and that the injunction and restraining order heretofore granted should be dissolved, and for costs.

Upon these findings judgment was entered, which is in substance a repetition of the findings and conclusions of law.

The assignments of error on the part of appellant are full and elaborate. They cover every point in the findings, conclusions of law, and in the judgment. The argument is ingenious and exceptionally able. Under our view of the case, only one finding of fact was necessary, and that is embraced in the sixth finding. The material fact, at last, is, Did plaintiff's claim have a vein, lead, lode, or mineral deposit whose apex was located within the exterior boundaries of the Good Enough mining claim, and which dipped into the Way Up claim? This is the ultimate fact to be found, and the one upon which the judgment must stand or fall. The sixth finding is a complete answer. That plaintiff should take nothing by this action, and the injunction and restraining order granted should be dissolved, was all that was necessary, and disposes of the case. As shown above, the answer does not contain a cross-bill, and it follows that the only proper judgment that could be rendered is that plaintiff take nothing by its action, that the injunction be dissolved, and costs awarded to defendant. But plaintiff contends that the evidence is insufficient to sustain the findings of fact, and that the court erred in the conclusions of law, and that the judgment is unsupported by the findings. In other words, that the judgment is contrary to the law and the evidence. An examination of the evidence shows that the Good Enough claim was located in a north-westerly and south-easterly direction adjoining this claim. On its north-easterly side line lies the Way Up. The latter extends lengthwise in a north-easterly and south-westerly direction, so that the south-west end line of the Way Up abuts against the north-east side line of the Good Enough. Plaintiff claims that the Good Enough is located along a vein or ledge of mineral-bearing rock in place, which extends through it substantially parallel with its side lines, and that

this vein or ledge dips in a north-easterly direction, passing its side lines into the Way Up; that defendant sunk a shaft near the line dividing the two claims, encountering plaintiff's vein on its dip, and were extracting the ore therefrom.

Defendant, on the other hand, insists that the Way Up claim is located along a fissure vein extending in a north-easterly and south-westerly direction, and substantially parallel with its side lines; that its shaft is sunk on this vein, and that the ore being taken out by it is from this vein.   That this vein extends through the Good Enough claim in a direction substantially at right angles to the side line to Good Enough.   And that the ore bodies which the plaintiff claims to be on its vein, and which it has a right to follow on its dip into the Way Up, form part of the Way Up vein or lode.   Section 2322 of the revised statutes of the United States gives the owner of a mining claim the right to follow his vein or lode on its dip only when such vein or lode dips (that is, departs from a perpendicular position) substantially at right angles with the strike of the vein or lode, and does not allow him to follow the vein outside of his claim on the course or strike of the vein in any case.   If the vein crosses the side lines on its strike, such side lines become the end lines, and terminate the owner's right to follow the vein in that direction.   *Mining Co.* v. *Tarbet,* 8 Otto, 463.   A large number of witnesses for defendant testify to the existence of a fissure vein in the Way Up claim.   They swear that they examined, saw, and traced it, and found ore in it.   That it passes from the Way Up claim, enters into the Good Enough, and crosses it. The judge who tried the case believed that.   And it is not for this court to say that his findings are incorrect.   The rule is too well established on this point for us to disturb it. now.   But plaintiff's counsel contend that, conceding that the Way Up fissure vein exists as testified by defendant's witnesses, still the evidence establishes the existence of the Good Enough vein, lode, ledge, or deposit.   That this Good Enough claim lode extends through the Good Enough claim parallel to its side lines, and dips into the Way Up.   That it has an average width of some sixty feet, and that plaintiff has the right, under section 2336 of the United States revised statutes, to take all ore at the intersection of the

two veins, the Good Enough being the older location. If, however, the sixth finding of fact is sustained by substantial evidence (and we think it is), then this point is not well taken. There is much evidence in the record which goes to show that the various ore bodies in the Good Enough claim, opposite the Way Up claim, are connected with the Way Up fissure vein, and flow from it, and although constituting flat ore bodies lying in strata of limestone, and at considerable distance from the fissure, yet are attached to and form a part of the Way Up vein. Ore bodies thus formed off from and connected with a fissure vein do not form a separate vein, lode, ledge, or mineral deposit. This evidence sustains the sixth finding of fact. It notes the ultimate fact at issue, and it was not necessary to find the probative facts which establish this ultimate fact. *Mining Co.* v. *Taylor*, 100 U. S. 37. The second conclusion of law, to the effect that plaintiff is entitled to take nothing by this action, and that the injunction and restraining order be dissolved, properly follows.

The point made by plaintiff's counsel, that the findings are insufficient in form and are mere conclusions of law, we think not well taken. The true test of the sufficiency of the findings is this, Would they answer if presented by a jury in the form of a special verdict? Tested by this rule, we think them sufficient to sustain the judgment: *Miller* v. *Steen*, 30 Cal. 402. From the fact, however, that defendant's answer does not contain a cross bill entitling it to affirmative relief, the judgment will be modified to the extent that plaintiff take nothing by its action, and that defendant go hence without day, and recover of plaintiff all costs and disbursements in this behalf incurred. In other respects, the judgment and orders appealed from will be affirmed, and it is so ordered.

FRENCH, C. J.:

I concur in the foregoing decision of Mr. Justice Pinney that the judgment as modified and the order appealed from be affirmed.